*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re KNEIFER, Minors.

UNPUBLISHED
April 21, 2022

No. 358695
Jackson Circuit Court
Family Division
LC No. 18-002322-NA

Before: BORRELLO, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's order terminating her parental rights to her four minor children under MCL 712A.19b(3)(b)(*ii*) (failure to prevent abuse).[1] We affirm.

Mother and father have five children in common: four daughters (CK, JK, DK, and GK) and one son (GEK). In 2018, the Department of Health and Human Services (DHHS) submitted a petition to remove father from the home and terminate his parental rights. An allegation had been made that father committed criminal sexual conduct (CSC) against a 12-year-old girl who was not his daughter. During investigation into the incident, mother and father's oldest daughter, CK, alleged that father also touched her inappropriately. Mother initiated divorce proceedings and the court entered an ex parte temporary custody order granting mother sole physical and legal custody of all five children, with father's parenting time being reserved. The court thereafter dismissed the 2018 petition. The parents' divorce became final in April 2019 and the children remained in mother's custody.

Children's protective services (CPS) received a complaint in June 2019, alleging that mother and the children lived with mother's partner, Joshua Dempsey, who was on the public sex offender registry (PSOR) for CSC with a child. Mother told CPS that Dempsey told her about his conviction, but she believed that he was innocent. Mother also stated that Dempsey did not watch the children alone. CPS told mother that she could be held responsible if she left the children alone with Dempsey and he abused them.

---

[1] Father was also a respondent, but the trial court did not terminate his parental rights.

CPS received another complaint in August 2020, alleging that officers conducted a welfare check on mother as a result of concerns that she was going to hurt herself. Mother had learned two days earlier that Dempsey had touched her daughter's, GK, vagina, but had not reported the incidents and allowed Dempsey to remain in the home. In September 2020, the DHHS filed a petition requesting that the trial court remove the four younger children from mother's care and terminate her parental rights, due to the above allegations.[2] The DHHS further alleged that mother's daughter, JK, reported that she was sleeping one night and "someone entered her bedroom, pulled her pajama bottoms down and touched her buttocks." Mother thought that JK might have been dreaming and did not report the incident. Mother agreed to not allow Dempsey back into the home until the children were interviewed at the child advocacy center (CAC). However, in September 2020, JK reported that Dempsey had still been in the home. The trial court ordered that the four children be taken into protective custody.

A termination trial took place on September 7, 2021, at the conclusion of which the trial court terminated mother's parental rights. This appeal followed.

Mother argues first that the trial court erred by finding that termination was proper pursuant to MCL 712A.19b(3)(b)(*ii*). We disagree.

A trial court's finding of a statutory ground for termination must be supported by clear and convincing evidence. *In re Terry*, 240 Mich App 14, 21-22; 610 NW2d 563 (2000). This Court reviews for clear error a trial court's finding that a statutory ground for termination existed. *Id*. at 22. Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*.

A trial court may terminate parental rights pursuant to MCL 712A.19b(3)(b)(*ii*), when a "child or a sibling of the child has suffered physical injury or physical or sexual abuse," the parent who had the opportunity to prevent the abuse "failed to do so [,] and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." At the termination trial, GK, who was nine years old at the time of the trial, testified that Dempsey touched her in an inappropriate place, which she explained meant underneath her underwear, when she was eight years old. GK told mother what happened, and mother kicked Dempsey out, but he later moved back in. Mother admitted at trial that GK disclosed the abuse to her, but claimed that GK later recanted the disclosure. Notably, however, GK's disclosure to mother included the same facts as GK's testimony at the termination trial.

DK, who was 11 years old at the time of the trial, testified that when she was 10 years old, she heard somebody crying one night. She went to mother and Dempsey's bedroom and saw Dempsey crying. DK wanted to comfort him and asked him what was wrong. Dempsey left the room and returned with no clothing on. Dempsey tried to hold her down, but she kicked him and ran out of the room. DK told mother about the incident one or two months later and asked mother to break up with him. Mother broke up with Dempsey, and he moved out. DK testified that Dempsey did not move back in, but he came back multiple times. Mother, on the other hand, testified that DK had not told her about Dempsey trying to touch her. Instead, DK had told her

---

[2] CK was no longer living with mother.

only that Dempsey had tried to console DK while he was in his boxers, which mother stated was "highly inappropriate."

JK, who was 14 years old at the time of the trial, testified that on Christmas Eve, she "woke up to someone touching her." JK explained that she was lying on her stomach when the person pulled down her pants and underwear and touched her below her clothing. JK did not see who it was, but she thought that it was Dempsey because he was the only man in the house, and her siblings would not have done it. JK testified that she told her mother what happened, but nothing changed in the home. Mother testified that in the incident about which JK testified, JK had fallen asleep in her younger brother's bed. Mother went in to cover her up and had to pull the blanket through JK's legs. When mother left the room, JK asked who touched her, and mother said that it was her. Mother stated that Dempsey was downstairs at the time.

Detective Sergeant Holly Rose, of the City of Jackson Police Department, testified that Dempsey had served eight years in prison as a result of a sexual assault conviction. Sergeant Rose testified that upon receiving a CSC complaint with respect to Dempsey in the home he was currently living in, she and CPS spoke with mother and told her that she could not let Dempsey be around the children or the children would be placed in foster care. Mother stated that she understood and told them that she would take the children camping for the weekend and then stay with a friend. Sergeant Rose testified that mother seemed to understand the safety plan, but when Sergeant Rose went to mother's apartment the following Monday, mother admitted that Dempsey had gone camping with them. Mother also told Sergeant Rose that all of her children were making up the allegations against Dempsey.

Mother admitted that she knew about Dempsey's CSC conviction, but she thought that Dempsey was innocent of his first case as a result of what she had read. And, she allowed the children to stay home alone with Dempsey. Mother testified that she kicked Dempsey out of the house after the "alleged touching," which "only occurred once," and that there was no evidence of abuse after Dempsey returned to the home. However, GK, JK, and DK each testified that they told mother about the abuse. It stands to reason that one of the incidents occurred first, and mother failed to prevent the next incident. Indeed, mother agreed that she violated the order to keep the children from Dempsey when she took them camping and stated that she did so after speaking with GK. Mother further failed to contact the police after any of the allegations made by her daughters. Instead, CK called the police.

Mother testified that she was no longer dating Dempsey, but they still lived together. Mother agreed that she placed her children at risk of harm by allowing them to be with Dempsey after their disclosures but did not agree that she failed to take reasonable steps to eliminate the risk, explaining that she kicked him out and only allowed him to return "because of what [she] was told." In short, mother knew of Dempsey's history of sexually abusing minors and was told by at least two of her daughter's that Dempsey had touched them inappropriately, but chose not to believe any of her children and chose Dempsey over the children's safety. The trial court found that the children were credible and that mother was not, and this Court will not second guess the trial court's credibility determinations. See, *In re HRC*, 286 Mich App 444, 460; 781 NW2d 105 (2009). The trial court thus properly determined that sexual abuse of the children had occurred and that mother had the opportunity to prevent the sexual abuse.

-3-

The trial court also properly determined that there was a reasonable likelihood that the children would again suffer abuse in the foreseeable future if returned to mother's care. See MCL 712A.19b(3)(b)(*ii*). Not only did mother admittedly leave the children alone with Dempsey despite knowing of his previous conviction, mother stated that she watched GK hug Dempsey following GK's disclosure of abuse and then took the children camping with him. Further, the camping trip occurred after CPS and Sergeant Rose told mother to keep the children away from Dempsey. Remarkably, once the children were removed from her care, mother also had Dempsey accompany her visit with the children. Cheryn Ernst, of the DHHS, testified that it was "very alarming and disturbing emotionally for the children," and it "indicated potential lack of concern for the severity of the children's mental health, as well as keeping Mr. Dempsey involved in [mother's] life." Ernst also testified that mother was not addressing and rectifying the issues that mother and Ernst identified during mother's social assessment. This is most readily demonstrated by the fact that mother was still living with Dempsey at the time of the trial. The trial testimony indicates mother's inability or unwillingness to protect her children from a man who has been convicted of CSC and against whom three of her children had made allegations of sexual abuse. Clear and convincing evidence thus supported the termination of mother's parental rights pursuant to MCL 712A.19b(3)(b)(*ii*).[3]

Mother argues next that the trial court erred by finding that termination was in the children's best interests. We disagree.

If the court finds that a statutory ground for termination has been established, a trial court must then find by a preponderance of the evidence that the termination was in the child's best interests in order to terminate parental rights. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014); MCL 712A.19b(5). This Court reviews for clear error a trial court's finding that termination was in a child's best interests. *Id*. at 713. Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake. *In re Terry*, 240 Mich App at 22.

In looking at a child's best interests, the trial court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714. The focus in making a best-interests determination is on the child rather than the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013).

At trial, Ernst testified that it was in the children's best interests to terminate mother's parental rights, explaining that mother "continue[d] to vacillate in her ability to—on what to

---

[3] Only one ground is necessary for terminating parental rights. See *In re HRC*, 286 Mich App at 461. Thus, if, as mother contends, the trial court erroneously considered a different ground, that consideration did not ultimately impact the termination.

believe and how to respond," which put the children at an increased risk of harm if returned to mother's care. Ernst testified that mother did not understand the severity of the abuse, as indicated by the fact that she still lived with Dempsey, and mother could not provide stability in a reasonable time. Ernst testified that three of the children were doing well in one licensed foster-care home, while JK was doing well in a different licensed foster-care home. Ernst testified that the children were bonded to their foster families and that a family member had expressed interest in adopting all four children.

Mother testified that she had always had a strong and close relationship with her children. Mother stated that she wanted what was best for her children, and she did not want her rights to be terminated. Mother stated that she "would like to try no matter how hard it is." Mother also acknowledged, however, that the children were thriving in their current placements and admitted that she was not able to provide proper care and custody for her children at the time of trial.

The testimony showed that the children were bonded to mother. The trial court properly noted this, and it allowed a visit after termination in order for the children to say goodbye to mother. However, the trial court considered many other factors in determining that termination was in the children's best interests and stated those findings on the record. Among them, the trial court considered the impact on permanency that termination would have, considering that it had determined not to terminate father's parental rights at the same time; that mother was "sorely lacking" in parenting ability; that adverse childhood experiences affect a child, but that the entrance of an adult who can provide stability, reassurance, and encouragement could help a child develop resilience; the children's testimony about domestic violence and sexual abuse; mother's testimony about her alcohol use, family involvement in court proceedings in other states, financial instability, and homelessness; that terminating mother's rights would move the children closer to permanency, stability, and finality, and; that at the time of the trial, the children had been in care for nearly one year already, and mother continued to live with Dempsey. Based upon the record evidence, the trial court did not err by finding that termination was in the children's best interests.

Finally, mother argues that she was denied effective assistance of counsel. We disagree.

"This Court has explicitly recognized that the United States Constitution guarantees a right to counsel in parental rights termination cases." *In re Williams*, 286 Mich App 253, 275; 779 NW2d 286 (2009). "The principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings; therefore, it must be shown that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). The question whether a defendant received the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). This Court reviews a trial court's findings of fact for clear error and reviews questions of law de novo. *Id*. However, as in this case, when no evidentiary hearing has been held, this Court's review is limited to mistakes apparent on the trial record. *Id*.

Mother argues that she received ineffective assistance on the basis that trial counsel did not cross-examine the DHHS's witnesses. It is true that an attorney can be ineffective for failing to call and examine witnesses. *In re AMB*, 248 Mich App 144, 232; 640 NW2d 262 (2001).

However, there are also numerous possibilities for why an attorney may refrain from cross-examination. Mother has not explained how choosing not to argue with children about their allegations on a vulnerable topic such as sexual abuse was deficient performance rather than sound trial strategy. See, *Heft*, 299 Mich App at 83 (there exists a strong presumption that defense counsel's decisions constituted sound strategy). Further, although mother's attorney also did not cross-examine Sergeant Rose or Ernst, it is unclear what different information Sergeant Rose could have provided in mother's favor when mother made admissions that included her choice to defy CPS and that GK had made disclosures to her.

Further, mother's counsel obtained the prosecutor's agreement to allow mother to testify in narrative form, indicating that counsel's treatment of mother's testimony was a matter of trial strategy. See *Heft*, 299 Mich App at 83. Mother's testimony format allowed mother the opportunity to share her version of events through her own chosen testimony. Moreover, mother's attorney directly examined her during the best-interest stage of the proceedings. The chosen trial strategy may not have ultimately prevented termination, but there is no indication that the representation fell below an objective standard of reasonableness. See *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004) ("A particular strategy does not constitute ineffective assistance of counsel simply because it does not work.").

It is true that mother's attorney made very limited argument in closing. However, because mother did not request a new trial or evidentiary hearing in the lower court, her attorney has not had the opportunity to explain this choice. And, counsel presented evidence through mother's testimony in both the adjudication stage and the best-interest stages. Mother has not explained what arguments trial counsel could have made in her favor during closing when mother admitted to much of the allegations against her, including her defiance of the order to keep Dempsey from the children and that she allowed him to move in despite knowing that he was on the sex offender registry.

Mother has also not explained how trial counsel's actions prejudiced her. Mother argues that having her testify other than in narrative form may have changed the outcome, but she has not provided any evidence of a reasonable probability that the outcome would have been different had her trial counsel elicited her testimony through direct examination instead. See *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Moreover, this was not, as mother alleges, a "weak" case. The children provided direct and specific testimony about Dempsey's actions toward them and mother's inactions when the abuse was brought to her attention. And, mother admitted to knowing that Dempsey was a convicted sex offender, that she took him and the children camping together after the CPS case was already open, that she had been told to keep Dempsey away from the children and did not do so, that she did not believe her children's allegations against Dempsey, and that she still resided with Dempsey.

Mother's attorney appropriately examined mother during the best-interest stage of the proceedings, but she still did not testify about any facts that took away from the trial court's many proffered reasons for its findings. See *In re Martin*, 316 Mich App at 87. Further, as previously discussed, there was clear evidence regarding the trial court's findings, so it is unclear what additional information trial counsel could have elicited to change the trial court's determination.

Finally, although mother refers to mother's changes in counsel throughout the proceedings, mother provides no explanation of how the changes prejudiced her. Because mother did not request an evidentiary hearing at the trial court level, there is no information available regarding mother's preparation for trial. Further, mother's attorney actively requested adjournments, and mother was clearly represented during trial. It is unclear what, if any, difference the changes in attorney made in this case. Therefore, mother was not denied effective assistance of counsel.

Affirmed.

/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Deborah A. Servitto